# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 02-CV-6470 (JFB) (RML)

————————————

LISLE KING,

Plaintiff,

VERSUS

INTERSTATE BRANDS CORPORATION,

Defendant.

————————————

**MEMORANDUM AND ORDER**
April 29, 2009

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Lisle King ("King" or "plaintiff") brings this employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, and New York Executive Law § 296 against Interstate Brands Corporation ("IBC" or "defendant"), alleging racially discriminatory failure to promote, hostile work environment, and retaliatory hostile work environment.

Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, defendant's motion is granted in part and denied in part.

## I. FACTS[1]

The Court has taken the facts described below from the parties' depositions, affidavits, and exhibits, and from the Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

Plaintiff is an African-American male. Plaintiff began working for IBC in 1981 as a garage mechanic at a depot in the Bronx.

————————————

[1] Where only defendant's Rule 56.1 Statement ("Def.'s 56.1") is cited, the facts are taken from defendants' 56.1 Statement, and plaintiff does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

(Def.'s 56.1 ¶ 3.) After about six months, plaintiff successfully bid on a garage mechanic job at a depot in Jamaica, Queens, where he worked from 1982 to 1990. (Def.'s 56.1 ¶ 3.) In that position, plaintiff performed maintenance on vehicles used by sales and distribution employees to distribute IBC's baked products to stores. (Stulberg Ex. 1.) In 1990, plaintiff successfully bid on a position as a garage mechanic at a depot in Farmingdale, Long Island, where he worked until he retired from IBC in 2007 (with the exception of a short period in 1991 when he worked at a depot in Hicksville, Long Island). (Def.'s 56.1 ¶ 3.)

As a garage mechanic, plaintiff reported to the Assistant Fleet Superintendent and the Fleet Superintendent (Stulberg Ex. 8 at 12-13.) Plaintiff was also supervised and given work assignments by the Sales and Distribution supervisors and managers who worked at the Farmingdale branch. (Stulberg Ex. 8 at 55-57; Ex. 14 at 20-21.) The Branch Manager is the highest position within the branch and is responsible for the overall operations of the branch. That position was filled by Gerald Guszack ("Guszack") from in or around 1990 until at least 2000, except for a six-month period in 1996. (Stulberg Ex. 14 at 23-28.) Guszack spent most of his time at the Farmingdale Branch in "the settlement room," a room near plaintiff's work area. (Stulberg Ex. 14, at 107-08.) As Branch Manager, Guszack reported to the Area Sales Manager, a position occupied by Al Perreca ("Perreca") between 1991 and 2003. (Stulberg Ex. 15 at 24.) Perreca regularly visited the Farmingdale Branch, as did high-level Account Executives, such as Frank Moran, and Contact Persons, such as Jack Lavista. (Stulberg Ex. 17 at 18-22, 37-39; Ex. 15 at 19-24.)

## A. EEOC Charge

On March 31, 2001, plaintiff filed an EEOC Charge alleging that IBC subjected plaintiff to a racially hostile work environment, unlawful retaliation and disparate treatment in terms of promotions, in violation of Title VII and NYSHRL. (Stulberg Ex. 1 ¶¶ 6, 10, 12.)

## B. Alleged Racially Hostile Work Environment

From roughly 1995 until 2002, plaintiff was subjected to regular racially disparaging comments, including racial slurs and jokes. For example, from 1998 through 2002, Guszack and other Caucasian employees regularly referred to plaintiff and other African-Americans as "n*****s" and "lazy n*****s," and regularly referred to African-American neighborhoods as "the jungle" and "the zoo." (Stulberg Ex. 3 at 12-13; Ex. 8 at 63-64, 168-69, 173-78; Ex. 11; Ex. 17 at 51-65; Ex. 15 at 171-84; Ex. 19 at 143-46, 153-57; Ex. 18 at 102-03, 108-10; Ex. 9.) During that period, other Caucasian employees referred to plaintiff using derogatory and profane language. (Stulberg Ex. 3 at 12-12; Ex. 8 at 172.)

In or around 2000, at the time of the trial of the abuse of Abner Louima, Caucasian employees, in the presence of Guszack, made comments to the effect that, "he [Mr. Louima] was a 'stinking n*****' and they should have pushed the stick up farther." (Stulberg Ex. 3 at 13; Ex. 8 at 180-82.) In or around June 2000, Vincent Pagano ("Pagano"), a Route Sales Representative, said "'N*****s' always beg for bread and always hold up trucks," in the presence of Guszack. (Stulberg Ex. 3, at 13; Ex. 8 at 178-80, 360.) In or around 2000, at the time of the trial for the death of Amadou Diallo,

Guszack stated something to the effect, "the police didn't shoot him enough, 'f*ggot n*****.'"

In or around 1997 or 1998, plaintiff heard Guszack refer to Leonard Barrett, an African-American employee at the Farmingdale branch as a "n*****" and stated that he would "love to get that 'n*****' out of here." (Stulberg Ex. 3 at 13-14.) Guszack told plaintiff in or around 1998, that Barrett had complained to Human Resources about, among other things, being called racially offensive names and being subjected to racist slurs by Guszack and others. After this, Guszack repeatedly complained about Barrett in plaintiff's presence, saying things like, "if I say anything in front of Lenny, he goes to his Uncle Gene [(referring to Gene Crawford, Human Resources Manager)]." Barrett then bid on and received a transfer to another depot. After he left, Guszack told plaintiff that he was "glad that 'n*****' is gone." (Stulberg Ex. 3 at 13-14; Ex. 8 at 148-50, 187-88, 256-58, 270-73.)

When plaintiff called in sick in or around 1998, Pagano told plaintiff that Guszack had called him a lazy "n*****." (Stulberg Ex. 3 at 14; Ex. 8 at 149, 169, 369; Ex. 12 at 5; Ex. 19 at 153-57; Ex. 18 at 102-03.)

On or about April 4, 2001, a Caucasian mechanic described plaintiff as "blacker than an engine," in the presence of a Caucasian Garage Department Manager, Steve Kloos, who took no action. (Stulberg Ex. 3 at 15-16; Ex. 8 at 36, 192-93.) In that same incident, the mechanic, who was covered in soot at the time, stated that he "was blacker than Lisle [(plaintiff)]." (Stulberg Ex. 23.) In roughly December 2000, Pagano told plaintiff a racist joke in the presence of Guszack and others. (Stulberg Ex. 3 at 16; Ex. 8 at 91.) Similar jokes were told frequently during this time period. (Stulberg Ex. 3 at 16-17; Ex. 8 at 91, 195.)

On several occasions, between 1995 and 1999, Pagano said to plaintiff, in the presence of Guszack, words to the effect, "Lisle, have you been at my house again? My kids are talking like blacks." Guszack laughed at such comments. (Stulberg Ex. 3, at 16; Ex. 8 at 125-26, 194-95.) Other similarly derogatory comments were made to plaintiff by other employees. (Stulberg Ex. 3 at 17.)

## C. Defendant's EEO Policy

Defendant contends that it maintained an equal employment opportunity policy. Specifically, defendant contends that it has maintained a written policy since 1988 "that prohibited racial harassment against employees and provided a complaint procedure for employees to follow." (Def.'s 56.1 ¶ 44.) Defendant further claims that, since 1998, it has posted a copy of the EEO Policy on the bulletin board at the Farmingdale Depot, and that since around that time, IBC has issued a copy of the policy annually in employees' paychecks. (*Id.* at 46-47.) Plaintiff disputes these claims and has testified that he never saw the policy posted, nor did he receive a copy of the policy at any time, prior to the filing of his EEOC Charge. (Stulberg Ex. 8 at 130-31; Ex. 7 ¶¶ 8-12; Ex. 16 at 125, 129-30.) Plaintiff has further stated that, during his employment at the Farmingdale Branch, he did not receive training related to any anti-discrimination or equal employment opportunity policy, nor did IBC provide him with notice of any procedure for employees to make complaints about racial harassment or discriminatory conduct. (Stulberg Ex. 7 ¶ 9.) Plaintiff further states that, given that high-level managers participated in and/or witnessed many racially hostile comments and jokes and took no action in response, no such policy was enforced or effective.

(Stulberg Ex. 12 at 3-5; Ex. 14 at 150-51; Ex. 17 at 51-65.)

## D. Promotion

Plaintiff contends that defendant should have promoted him to the position of Engineering Supervisor at the Bakery in Jamaica. (Def.'s 56.1 ¶ 6.) Prior to 2002, IBC did not maintain a written position description of the responsibilities or requirements of an Engineering Supervisor. The description written after 2002 states that the Engineering Supervisor "[p]lans and directs overall engineering and maintenance activities of a shift. Focuses on continuous improvement of downtime and cripples and corporate revenue generation." (Chaudhry Decl., Ex. A.) The Engineering Supervisor is "[r]esponsible for hourly technical support staff" and "equipment reliability and maintenance cost controls." (*Id.*) An Engineering Supervisor must also:

1. Understand planned shift responsibilities and goals. Supervise shift mechanics so as to meet these goals and respond effectively to emergencies. Communicate status of shift results to the following shift and others who require the information.

2. Take daily walk-through of assigned areas of responsibility. Note all equipment and facility discrepancies. Insure any necessary corrective actions are initiated.

3. Focus on the reduction of downtime and cripples and quality improvement. Take the responsibility to initiate corrective actions.

4. Complete all necessary reports to document the results of the shifts activities.

5. Assess mechanics technical and troubleshooting skills. Provide training and counseling as necessary so that all assigned personnel meet acceptable performance standards.

6. Troubleshoot problems in all plant areas where technical assistance is needed.

7. Conduct regular inspections to evaluate crew efficiency and takes corrective action if required.

8. See that production personnel are properly instructed in operation and care of equipment.

9. Prepare and carry out preventive maintenance program in accordance with company policies.

10. Insure that maintenance employees work safely and make sure that equipment is maintained in safe operating condition.

11. To perform other duties relating to efficient operation of bakery as assigned.

(*Id.*) With respect to the qualifications for an Engineering Supervisor position, the Company required two to four years experience in commercial plant engineering, with preferred previous work experience as a Bakery Maintenance Engineer. (*Id.*)

Plaintiff alleges that he was qualified for this position, but that, during the relevant time period, he was not notified of or considered for such a position. During the relevant period, IBC never posted openings for the Engineering Supervisor position and

plaintiff never knew that openings existed for that position. (Stulberg Ex. 8 at 72-73, 75-76, 82-83; Ex. 21 at 109-11; Ex. 20 at 80, 331; Ex. 22 at 213, 236; Ex. 3 at 10-11.)

With respect to how many Engineering Supervisor positions were filled during the relevant period, as Chief Engineer from 1997 through 2008, Shaukat Chaudhry ("Chaudhry") was responsible for the hiring and promoting of persons into the Engineering Supervisor positions. (Chaudhry Decl. ¶3.) Chaudhry states that he has "never considered a garage mechanic for the position of Engineering Supervisor at the Jamaica Bakery." (*Id.* ¶ 12.) Chaudhry's declaration states that during the period of December 1, 1999 through December 31, 2006, IBC filled four Engineering Supervisor positions, with two African-Americans and two Hispanics: (1) on April 5, 2000, IBC hired Montague James, an African-American, to the position of Engineering Supervisor at the Jamaica Bakery;[2] (2) on April 2, 2001, IBC hired Jean-Price Vixama, an African-American, to the position of Engineering Supervisor at the Jamaica Bakery; (3) in June of 2003, IBC promoted Mario Lopez, an Hispanic, from a position of Maintenance Mechanic in the bakery to the position of Engineering Supervisor; and (4) in August 2006, IBC promoted Pedro Pizarro, an Hispanic, from the position of Maintenance Mechanic in the bakery to Engineering Supervisor. (*Id.* ¶¶ 5-10.)

In Chaudhry's deposition, he also testified that sometime in 1998 or 1999 a sales supervisor named Mike or Michael was hired into the position of Engineering Supervisor. (Chaudhry Dep. at 95-96.) The parties have not identified anything in the record that reflects this person's race. Chaudhry also testified in his deposition that he had hired at least one person with experience in an industry other than the bakery industry for a supervisory position. (Chaudhry Dep. at 229.) That person was Craig Fryer, who had previously been "managing the engineering mechanical electrical machine work." (Chaudhry Dep. at 230.) The parties have not identified anything in the record that reflects this person's race, or when he was hired.

Plaintiff contends that IBC has hired and/or promoted Caucasian individuals who are less experienced and less qualified than he is into the Engineering Supervisor positions. (Stulberg Ex. 3 at 9; Ex. 8 at 72-73.) Plaintiff, however, has not identified any such individuals. Plaintiff contends that he has experience with the machinery maintained by the Engineering Supervisors, had eight years of experience as a supervisor, and had the skills and training required to perform the duties of the Engineering Supervisor position. (Stulberg Ex. 8 at 72-73, 79-80, 310-11.) Plaintiff did not work on equipment located in the Jamaica Bakery plant.

---

[2] These individuals had the following prior experience: (1) James had 16 years of experience as an engineering supervisor at the Jamaica bakery; (2) Vixama had 12 years of experience as an electrical maintenance technician, had prior supervisory experience, and had four years experience with certain equipment utilized at the Jamaica bakery; (3) Lopez held a certificate in refrigerant transition and recover, had 8 years of experience in the repair and maintenance of bakery manufacturing equipment, and had worked for several years as a Maintenance Mechanic at the Jamaica bakery; and (4) Pizarro had 10 years experience as a Maintenance Mechanic, had completed the AIB electrical course, and had displayed strong leadership skills as a union delegate and as a member of the safety and energy conservation committees. (Chaudry Decl. ¶¶ 5-10.)

### E. Alleged Retaliation

On April 18, 2000, *Boyd v. IBC* was filed as a class action lawsuit against IBC alleging discrimination on the basis of race. Various African-American IBC employees were plaintiffs in the suit. The suit alleged that "IBC maintained a racially hostile work environment in that Caucasian IBC managers and employees, among other things, subjected the named plaintiffs and putative class members to racially hostile comments and taunts. . . ." (Stulberg Ex. 5.) On February 12, 2001, the plaintiffs in the *Boyd* action served an answer to an interrogatory on IBC that stated, among other things, that "[o]n several occasions in or around July 2000, Lisle King, an African-American IBC employee, heard Caucasian Route Sales Representatives, including but not limited to, Vinny Pagano and Manny (last name unknown), mock plaintiffs' opposition to racial discrimination by taunting Mr. King, in the presence of Caucasian supervisors, with the following statement, in words or effect: "The n*****'s here. Can't say 'n*****' anymore." (Stulberg Ex. 6.)

Since in or around July 2000 and continuing until in or around March 2002, Caucasian employees, including, but not limited to, Mr. Bretana and Mr. Pagano, have taunted plaintiff, in the presence of Caucasian supervisors, including but not limited to, Al Perreca, with the following statements in words or effect: "N*****'s here," "N*****'s here. Can't say 'n*****' anymore" and "Can't say 'n*****' anymore or we might get sued." (Stulberg Ex. 3 at 19-21; Ex. 4 at 7.; Ex. 8 at 159-162, 217, 285-87.)

### II. PROCEDURAL HISTORY

Plaintiff filed this action on December 13, 2002. Defendant filed its answer on January 13, 2003. Defendant filed this motion for summary judgment on September 2, 2008. Plaintiff filed his opposition to this motion on February 10, 2009. Defendant submitted its reply on March 17, 2009. Oral argument was heard on April 22, 2009. All of the parties' submissions have been considered.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v.*

*Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *St. Paul Mercury Ins. Co. v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, 04 civ 360 (DGT), 2007 U.S. Dist. LEXIS 56884, at *18 (E.D.N.Y. Aug. 2, 2007). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

In addition, the Second Circuit has provided specific guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## IV. DISCUSSION

### A. Failure to Promote

Plaintiff brings claim that he "was treated disparately in terms of promotions," on the basis of race. (Plaintiff's Memorandum of Law, at 24.) Specifically, plaintiff contends that he should have been promoted to the position of Engineering Supervisor during his employment with IBC.[3] Defendant

---

[3] The Court notes that plaintiff's complaint also alleges that he should have been promoted to the Supervisory Automotive Mechanic position, but plaintiff appears to concede that such a claim is time-barred. (Plaintiff's Memorandum of Law, at 14 ("IBC has asserted that Mr. King's discriminatory promotion claim is untimely, because there are only three Supervisory Automotive Mechanic positions at IBC, none of which has been filled since 1990, except for a Garage Supervisor position in 2006. Defendant posted a Garage Supervisor position in mid-2006, but plaintiff testified that he did not apply for that

argues that plaintiff has failed to establish a *prima facie* case for this claim because (1) he did not apply for the position at issue and, (2) he was not qualified for such position. Further, defendant argues that, even if plaintiff were able to make out a *prima facie* claim, defendant has articulated a non-discriminatory reason for its conduct that plaintiff has not rebutted. For the reasons set forth below, the Court agrees that the plaintiff has not put forth evidence on this claim to support a finding of discrimination by a rational jury and, therefore, defendant's motion for summary judgment on plaintiff's failure to promote claim is granted.

### 1. Legal Standard

Because plaintiff presents no direct evidence that he was not promoted because of his race, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, plaintiff can establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected category; (2) he applied for an available position; (3) he was qualified

_____

position because he intended to retire soon thereafter. Mr. King provided notice of his retirement in January 2007 and retired effective March 1, 2007. Mr. King alleges, however, that, in addition to the Supervisory Automotive Mechanic positions, he has been eligible and qualified for promotion to [Engineering Supervisor].").) To the extent that plaintiff continues to pursue his claim as to the Supervisory Automotive Mechanic position, the Court grants summary judgment in defendant's favor on this claim. Plaintiff has put forward no evidence to counter defendant's evidence that no positions were available between 1990 and 2006, and therefore, any positions before 1990 would be time barred. The 2006 position cannot support plaintiff's claim because he has stated that he was not interested in a position at that time because he was planning to retire.

for the position; and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Moreover, "[a]n inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case, as well as additional

evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. Application

Defendant argues that plaintiff has not satisfied the *prima facie* showing required to survive summary judgment on this claim because he did not apply for the Engineering Supervisor position at issue, nor did he indicate his interest in the position informally. Defendant further argues that plaintiff was not qualified for the Engineering Supervisor position. Plaintiff contends that he was qualified for the position at issue and that the requirement to apply for such a position does not apply here, pursuant to the Second Circuit's guidance in *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d Cir. 2004), because there is uncontroverted evidence that defendant never posted such openings prior to 2002 and plaintiff was not aware of them. For purposes of this motion, the Court assumes *arguendo* that plaintiff has satisfied his *prima facie* case, and, for the reasons set forth below, finds that summary judgment is still appropriate because the defendant has articulated non-discriminatory reasons for its promotion decisions, and plaintiff has not put forth evidence that is sufficient to create a genuine issue of fact as to whether discrimination was a substantial or motivating factor in the failure to promote plaintiff.

Defendant, here, contends that plaintiff was not considered for the Engineering Supervisor positions in the bakery because he worked as a garage mechanic at a small depot 25 miles from the bakery, had never worked in the bakery, nor had he ever expressed any interest in working in the bakery. Defendant further contends that IBC never considered garage mechanics for the position at issue, and, therefore, their failure to consider plaintiff was consistent with that practice. (Chaudhry Decl. ¶ 12.) They also note that they hired other African-American employees for the position. In fact, they have put forth evidence that the four available positions that were filled between 1999 and 2006 were filled by two African-Americans and two Hispanics. (*Id.* ¶ 5.) Defendant explained that Chaudhry was solely responsible for the hiring and promoting for Engineering Supervisor positions, that he did not know King, and that King had never worked in the

Maintenance/Engineering Department. (*Id.* ¶ 13.) This evidence clearly satisfies defendant's burden to put forth a non-discriminatory explanation for the failure to promote.

Plaintiff has offered no evidence to support a finding by a rational jury that defendant's explanation is pretextual. It is undisputed that the hiring decisions for the Engineering Supervisor position were made by Chaudhry, that Chaudhry did not know plaintiff, and that Chaudhry never considered a garage mechanic for a position as an Engineering Supervisor. (Def.'s 56.1 ¶¶ 28-30.) Plaintiff has pointed to nothing to raise an inference that Chaudhry was discriminatory in his selections or to call into question any of the explanations offered by Chaudhry. Plaintiff's papers only make conclusory statements that defendant hired a disparate number of Caucasians for supervisory positions, but plaintiff has not identified a single Caucasian hired to the Engineering Supervisor position during the relevant period. In fact, as noted above, the only evidence in the record is that the four available positions between 1999 and 2006 were filled by two African-Americans and two Hispanics.[4]

In short, given the defendant's non-discriminatory explanations and the uncontroverted evidence – including (1) that plaintiff never applied for the position, (2) that the job of Engineering Supervisor involves supervision of engineering and maintenance activities with respect to sophisticated bakery equipment, and plaintiff had never worked in any bakery but rather had repaired cars and trucks his entire career as a garage mechanic, (3) the four individuals promoted, which

included two African-Americans and two Hispanics, had far greater qualifications and relevant experience than plaintiff – and the lack of any evidence proffered by plaintiff to rationally support a finding of pretext in connection with the promotion decisions, this claim cannot survive summary judgment. *See, e.g., DeSalvo v. Volhard*, No. 07-4403-CV, 2009 WL 481875, at *1 (2d Cir. Feb. 26, 2009) ("[W]e agree with the district court that the SSA offered legitimate, non-discriminatory reasons – a lack of qualification and failure to apply for promotions – that account for why DeSalvo was not promoted. DeSalvo has not offered sufficient evidence to raise a genuine issue of material fact with respect to whether discrimination was more likely the reason for the absence of a promotion than her qualifications and failure to apply."); *see also Butts v. NYC Dep't of Hous. Preservation and Dev.*, No. 07-1930-cv, 2009 WL 190403, at *2 (2d Cir. Jan. 28, 2009) ("In the present case, the district court correctly concluded that Appellant failed to proffer evidence sufficient to create a genuine issue [of fact] to be tried as to whether discrimination was a substantial or motivating factor in the decision to promote Mack and the other employment decisions of which she complains. . . . Appellant provided no credible evidence to show that any of the explanations advanced by Appellee were a pretext for discrimination."); *Warren v. N. Shore Univ. Hosp. at Forest Hills*, 268 Fed. Appx. 95, 97, 2008 WL 627815 (2d Cir. Mar. 7, 2008) ("[Plaintiff] offers no substantive evidence that [the decisionmaker's] asserted reasons for not hiring [plaintiff] were false, and we therefore must conclude that there is no genuine issue of material fact to be decided by a jury."); *Morris v. Ales Group USA, Inc.*, No. 04 CV 8239 (PAC) (THK), 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007) (granting summary judgment for

_____

[4] Indeed, the only promotion to an Engineering Supervisor position prior to plaintiff's EEO complaint in 2001 was filled in April 2000 by a person with superior qualifications who was a member of the same protected class as plaintiff.

employer where, among other things, plaintiff "presented no evidence that she actually applied for these positions, or that these positions were filled by people not in her protected class (except Educator), or that [the employer] continued to seek applicants with her qualifications").

Plaintiff's primary argument is that he was also qualified for the position. To the extent that defendant relies on plaintiff's lack of bakery experience as an explanation for not promoting him, plaintiff asserts that at least one individual without prior bakery experience was hired to the position. Plaintiff does not identify the race of that individual, nor does plaintiff dispute that an application was filed by that person.

Plaintiff's argument that he was also qualified for the position, and possibly at least as qualified as one successful application, is not enough to raise an inference of discrimination that survives summary judgment. The Second Circuit has examined cases similar to the one before this Court and has held that "[t]he employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 641 (2d Cir. 1986). "Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision. . . . At the same time, the court must respect the employer's unfettered discretion to choose among qualified candidates." *Byrne v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (internal quotations and citations omitted). The Second Circuit in *Byrne* went on to articulate the following standard:

When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Id.* at 103 (internal quotation marks omitted); *see also Chambers-English v. Unisys Corp.*, No. 07-1068-cv, 2008 U.S. App. LEXIS 23421, at *2 (2d Cir. Nov. 12, 2008) (affirming the lower's court entry of judgment in defendant's favor where the record "falls far short of demonstrating that [plaintiff's] qualifications were so superior to [the selected candidate's] that no reasonable person, in the exercise of impartial judgment, could have chosen [the selected candidate] over [plaintiff] for the job in question.") (internal quotation marks omitted); *Timothy v. Our Lady of Mercy Med. Ctr.*, No. 06-0081-cv, 2007 U.S. App. LEXIS 3980, at *8-*9 (2d Cir. Feb. 21, 2007) ("absent a striking disparity in . . . credentials, one should be very hesitant to draw any inference from a battle of credentials"). In sum, even assuming *arguendo* plaintiff has raised an issue of fact as to whether he was qualified for the position, he has not put forth any evidence showing that he was more qualified, much less "strikingly" more

qualified, for the position than the individuals hired. In fact, the uncontroverted evidence demonstrates that the four individuals hired (including two from the same protected class as plaintiff) were far more qualified than plaintiff. Thus, plaintiff's purported qualifications for the position do not support a finding of discrimination, and plaintiff has put forth nothing that does. The Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). That is precisely the situation here on the failure to promote claim. Plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that, more likely than not, plaintiff's race was the real reason for the failure to promote. Accordingly, the Court finds that plaintiff has failed to raise a genuine question of fact as to his failure to promote claim and grants defendant's motion for summary judgment.[5]

## B. Racially Hostile Work Environment

Plaintiff claims that defendant subjected him to a racially discriminatory hostile work environment. Defendant contends that summary judgment is warranted on this claim because the affirmative defense outlined in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998), applies.

## 1. Legal Standard

In order to prevail on a hostile work environment claim, a plaintiff must satisfy two elements: "'(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999)); *accord Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003); *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000).

With respect to the first element – which determines whether or not a hostile work environment can be established, the Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law. *See Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217 F.3d at 154 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); see also *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. N.Y.C.*

---

[5] To the extent that plaintiff is also asserting a retaliatory failure to promote claim, the Court finds that summary judgment is warranted on such a claim, as well. Plaintiff has put forth no evidence to support a finding of retaliatory animus behind defendant's failure to promote plaintiff, and, as discussed *supra*, plaintiff has identified no evidence which would rationally support a finding of discrimination as to the failure to promote, retaliatory or otherwise.

*Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment").

"Isolated instances of harassment ordinarily do not rise to this level." *Cruz*, 202 F.3d at 570; *see also Faragher*, 524 U.S. at 788 (holding that "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citations and quotations omitted); *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (noting that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild . . . to create an abusive working environment"); *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (holding that "to meet his burden, the plaintiff must show more than a few isolated incidents" and "evidence solely of sporadic" discrimination does not suffice) (internal quotations omitted); *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a "b****" and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Augustin v. Yale Club of N.Y.C.*, No. 03 Civ. 1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding that "four or five" comments over a five-year period insufficient to support a hostile work environment claim);

*Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497 (JBW), 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding two "alleged isolated remarks" by plaintiff's supervisor insufficiently "frequent and pervasive"); *Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004) (denying hostile work environment claim where incidents were "too remote"); *Pagan v. New York State Div. of Parole*, No. 98 Civ. 5840 (FM), 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that two racially derogatory remarks by supervisor directly to plaintiff did "not amount to the sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII") (citations omitted); *Upshur v. Dam*, No. 00 Civ. 2061 (DC), 2003 WL 135819, at *7-*8 (S.D.N.Y. Jan. 17, 2003) (finding one week of "patronizing and racist comments" by supervisor insufficient); *Hawana v. City of N.Y.*, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (finding single remark by supervisor insufficient); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (finding that supervisor's use of racially derogatory slur to refer to defendant on four or more occasions did not alter conditions of employment significantly enough to implicate Title VII); *Francis v. Chem. Bank. Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents).

The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and

concerted" conduct, "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (quotations and citation marks omitted) (alteration in original). The point is that the conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.*

## 2. Application

### (a) Severe or Pervasive Harassment

As summarized below, plaintiff has set forth sufficient evidence to clearly raise genuine issues of fact as to whether the workplace was permeated with discriminatory harassment that was sufficiently severe or pervasive as to alter the conditions of his work environment.

Viewing the record in the light most favorable to plaintiff, the non-moving party, there is sufficient evidence upon which a reasonable juror could find that plaintiff was subject to such severe and pervasive harassment as to change the terms and conditions of his employment. Plaintiff has put forth evidence that, from 1995 until in or around 2002, plaintiff was subjected to a steady stream of "vicious racial slurs" and "racially demeaning jokes." Some of these incidents, as described by plaintiff, may be sufficiently shocking on their own to support plaintiff's claim, and when analyzed in light of the other conduct, certainly support a finding of a hostile work environment. Plaintiff also asserts that "[f]rom in or around 1998 and continuing to at least 2002, on a regular basis, Caucasian managers, including without limitation, Gerald Guszack, a Branch Manager and Lead Supervisor, and employees, including, without limitation, John Dineese, a Lead Mechanic, Vincent Pagano, a Route Sales Representative, and Manny Bretana, a Route Sales Representative, referred to African-Americans, including plaintiff, as 'n*****s' and 'lazy n*****s.'" (Plaintiff's Memorandum of Law, at 4.) Plaintiff further contends that, "[f]rom in or around 1999 and until at least in or around May 2001, on a daily basis, a Causasian supervisor named Charlie Haug referred to Mr. King as a 'motherf****er,' in the presence of, among others, a Caucasian supervisor named Joe Siringo." (*Id.*) Plaintiff further states that, "[f]rom in or around at least 1998 until in or around December 2000, Caucasian employees, including but not limited to, Guszack and Pagano, regularly and openly referred to African-American neighborhoods (but not to Caucasian neighborhoods) as 'the jungle' and 'the zoo.'" (Plaintiff's Memorandum of Law, at 4-5.) Plaintiff has put forth evidence that an additional twenty racially discriminatory incidents occurred between 1995 and 2000 in the presence of supervisors, including racially insensitive jokes and comments and calling plaintiff by racially derogatory names. (Plaintiff's Memorandum of Law, at 5-10.) If plaintiff's evidence is credited, there is absolutely no question that a juror could reasonably find the harassment was sufficient severe and pervasive to constitute a hostile work environment. *See, e.g., Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). Further, as the nature of these incidents are racially-related on their face – not neutral incidents – plaintiff has put forth sufficient evidence to support his claim, for purposes of surviving summary judgment, that these actions are related to his race. Defendant does not appear to dispute that these incidents, if credited by a jury, would support a finding of a hostile work environment based upon race; rather, defendant argues that it has an affirmative defense under *Faragher/Ellerth,* which

entitles it to summary judgment. The Court will now turn to an analysis of this affirmative defense.

(b) *Faragher/Ellerth* Affirmative Defense

With respect to the hostile work environment claim, defendant contends that it is entitled to the *Faragher* affirmative defense as a matter of law and, thus, cannot be held vicariously liable for any alleged harassment by its employees towards plaintiff. As set forth below, the Court disagrees and denies summary judgment on plaintiff's hostile work environment claim. Specifically, there are disputed issues of material fact with respect to the application of this affirmative defense that must be decided by a jury.

i. Legal Standard

As the Second Circuit has noted, "[t]he Supreme Court has ruled that employers are not automatically liable for . . . harassment perpetrated by their employees. In instances where the harassment in the form of a hostile work environment is alleged to have been committed by non-supervisory co-workers, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino*, 385 F.3d at 225. However, in instances where the alleged harassment involves a supervisory employee, the court first looks to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 765; *accord Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004). If the harassment resulted in a tangible

employer action, "the employer will, ipso facto, be vicariously liable." *Mack*, 326 F.3d at 124; *accord Petrosino*, 385 F.3d at 225. Moreover, even "[i]n the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it 'exercised reasonable care to prevent and correct promptly any [discriminatorily] harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Petrosino*, 385 F.3d at 225 (quoting *Ellerth*, 524 U.S. at 765).

A defendant may attempt to satisfy the first element by "the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006). As to the second element, "proof that an employee has unreasonably failed to use the employer's complaint procedure normally suffices to satisfy the employer's burden." *Id.* Of course, if "the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Whidbee*, 223 F.3d 62, 73 (2d Cir. 2000) (citation omitted).

ii. Application

Plaintiff, here, does claim the existence of a tangible adverse employment action in the form of the failure to promote, as discussed above. As that claim fails summary judgment, however, defendant may still attempt to rely on this affirmative defense. *See Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003); *Petrosino v. Bell Atl.*, 385 F.3d

210, 224 (2d Cir. 2004). The Court finds, however, that there are material issues of disputed fact as to whether defendant has met its burden of establishing the defense. Specifically, it is disputed whether defendant took appropriate care to prevent discrimination, and whether plaintiff can adequately explain his failure to take advantage of any preventive or corrective opportunities. Therefore, summary judgment is not appropriate on plaintiff's hostile work environment claim. *Petrosino*, 385 F.3d at 225-26.

Defendant contends that it had an "EEO anti-harassment policy with an anti-retaliation provision under which Plaintiff should have made a complaint of discrimination directly to Defendant's Human Resource Manager without first reporting the alleged conduct to his immediate supervisor." (Defendant's Memorandum of Law, at 8.) Defendant further argues that plaintiff's failure to make a complaint under Defendant's EEO Policy, "or any other complaint prior to his EEOC charge on March 30, 2001," bars his claim. (Defendant's Memorandum of Law, at 8-9.)

Plaintiff argues that the EEO policy defendant relies upon to support this defense was not enforced, nor was it effective, and, therefore, it cannot satisfy defendant's burden. (Plaintiff's Memorandum of Law, at 18 (citing *Wilburn v. Fleet Fin. Group, Inc.*, 170 F. Supp. 2d 219, 230 (D. Conn. 2001) (holding that factors relevant to the analysis of the first prong of this defense include "whether the [EEO] policy is seriously enforced, whether employees are informed how to report . . . harassment, and whether the policy is effectively communicated to employees.")).) In support of this argument, plaintiff has put forth evidence that (1) "several of defendant's managers regularly used and/or encouraged the use of severe racial epithets, including 'n*****,' thereby flagrantly flouting defendant's so-called 'EEO Policy;'" (2) "defendant's managers failed to discipline employees who they witnessed engaging in

racially hostile conduct;" (3) "defendant's purported 'EEO Policy' was not posted at plaintiff's work location;" (4) "defendant conducted no racial harassment training;" and (5) "IBC did not provide King with notice regarding any procedure for lodging complaints about racial harassment or discrimination." (Plaintiff's Memorandum of Law, at 19.) On this evidence, there are disputed issues of material fact as to whether defendant took reasonable care to prevent discrimination. *See Pugni v. Reader's Digest Ass'n*, No. 05 Civ. 8025, 2007 U.S. Dist. LEXIS 26284, at *50 (S.D.N.Y. Apr. 5, 2007) ("The employee can rebut the employer's proof of an existing anti-harassment policy by showing that the policy is not effective."); *Wilburn v. Fleet Fin. Group, Inc.*, 170 F. Supp. 2d 219, 228 (D. Conn. 2001) ("In proving 'reasonable care' under the first prong of the *Faragher/Ellerth* affirmative defense, whether an anti-harassment policy has been effectively published and disseminated among the employees is an 'important consideration' in determining whether the defendant has met its burden under the first prong.")

Even assuming *arguendo* that there were no disputed issues of fact as to the first prong of this defense, there are disputed issues of fact as to the second prong. "The Second Circuit utilizes a burden-shifting approach with respect to the second prong of the *Faragher/Ellerth* defense, *i.e.*, whether plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. The employer bears the initial burden of showing that plaintiff completely failed to utilize the complaint procedures. If the employer carries this burden, the burden of production shifts to the plaintiff to demonstrate a reason or reasons as to why such procedures were not utilized. The employer is then entitled to rely on the

absence or inadequacy of such proffered reason or reasons in carrying its ultimate burden of persuasion." *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 208 (N.D.N.Y 2002) (citing *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001)).

Here, defendant has satisfied its initial burden by demonstrating that plaintiff did not make a complaint about the events described above. Plaintiff does not dispute that he did not make complaints about the conduct prior to his EEOC charge, but plaintiff contends that defendant never made him aware of a complaint procedure. Plaintiff has also put forth evidence that his supervisors were among the worst perpetrators of these acts and, therefore plaintiff reasonably may not have wanted to complain to them. And, finally, plaintiff has put forth evidence that he reasonably believed that another African-American employee who made a complaint to Human Resources was subjected to retaliatory harassment by Guszack.[6] If this evidence is credited, a rational jury could find that it was reasonable for plaintiff not to avail himself of any preventive or corrective opportunities provided by his employer. Therefore, there are clearly disputed issues of

material fact as to the applicability of this affirmative defense, and defendant's motion for summary judgment must be denied.

## C. Retaliation

On April 18, 2000, *Boyd v. IBC* was filed as a class action lawsuit against IBC, alleging discrimination on the basis of race. Various African-American IBC employees were plaintiffs in the suit. The suit alleged that "IBC maintained a racially hostile work environment in that Caucasian IBC managers and employees, among other things, subjected the named plaintiffs and putative class members to a racially hostile comments and taunts. . . ." (Plaintiff's Memorandum of Law, at 10 (citation omitted).) On February 12, 2001, the plaintiffs in the *Boyd* action served an answer to an interrogatory on IBC that stated, among other things, that "[o]n several occasions in or around July 2000, Lisle King, an African-American IBC employee, heard Caucasian Route Sales Representatives, including but not limited to, Vinny Pagano and Manny (last name unknown), mock plaintiffs' opposition to racial discrimination by taunting Mr. King, in the presence of Caucasian supervisors, with the following statement, in words or effect: 'The n*****'s here. Can't say 'n*****' anymore.'" Plaintiff has also put forth evidence that Mr. Bretana has made comments such as "Be quiet, he's here," meaning a black person is here, and "Shhh . . . he's here," when Mr. King [and another African-American employee] entered the settlement room at the Farmingdale Branch, "that he made such statements loud enough for Mr. King . . . to hear, so that [he would] know that he was referring to [Mr. King]," and that he had not made such comments about Caucasian employees. (*Id.*) Plaintiff has put forth evidence that "[a]fter the *Boyd* action was filed and continuing for a year after plaintiff filed his EEOC Charge, Caucasian IBC employees taunted Mr. King

---

[6] In or around 1997 or 1998, plaintiff heard Guszack refer to Leonard Barrett, an African-American employee at the Farmingdale branch as a "n*****" and state that he would "love to get that 'n*****' out of here." (Stulberg Ex. 3 at 13-14.) Guszack told plaintiff in or around 1998, that Barrett had complained to Human Resources about, among other things, being called racially offensive names and being subjected to racist slurs by Guszack and others. After this, Guszack repeatedly complained about Barrett in plaintiff's presence, saying things like, "if I say anything in front of Lenny, he goes to his Uncle Gene [(referring to Gene Crawford, Human Resources Manager)]." Barrett then bid on and received a transfer to another depot. After he left, Guszack told plaintiff that he was "glad that 'n*****' is gone." (Stulberg Ex. 3 at 13-14; Ex. 8 at 148-50, 187-88, 256-58, 270-73.)

for his perceived participation in the *Boyd* action and for filing the EEOC Charge." (*Id.* at 10, 23.)

The Court evaluates a Title VII retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A. W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

Defendant alleges that plaintiff cannot state a *prima facie* case of retaliation because plaintiff has not put forth sufficient evidence establishing (1) that defendant took materially adverse action against plaintiff during the relevant time period, and (2) a causal connection between the protected activity and the alleged retaliatory harassment. Plaintiff contends that he has adequately supported a claim of hostile retaliatory harassment and that the statements themselves provide direct evidence of retaliatory animus.

## 1. Materially Adverse Action

The Supreme Court recently stated in *Burlington Northern & Santa Fe Ry. v. White* that an "adverse employment action" is one which a reasonable employee would have found to be "materially adverse" and which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 60 (2006). Plaintiff's claim relies on evidence of a retaliatory hostile work environment.

In order to establish a retaliatory hostile work environment, a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct. *See, e.g., Rasco v. BT Radianz*, No. 05 Civ. 7147 (BSJ), 2009 WL 690986, at *15 (S.D.N.Y. Mar. 17, 2009) ("To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment."); *Faison v. Leonard St., LLC*, No. 08 Civ. 2192 (PKC), 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) (same); *McWhite v. New York City Housing Authority*, No. 05 CV 0991 (NG) (LB), 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008); *see also Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) ("An allegedly retaliatory act must rise to some level of substantiality before it can be actionable. The hostile work environment doctrine, as developed in the anti-discrimination jurisprudence of Title VII,

embodies that prerequisite.") (citation omitted); *Rigau v. Pfizer Caribbean Corp.*, 525 F. Supp. 2d 272, 287 (D.P.R. 2007) (same).[7]

The standard for a hostile work environment is laid out *supra*. Although the Court has already determined that plaintiff has proffered sufficient evidence to survive summary judgment on a hostile work environment, the Court must now determine whether there is sufficient evidence under the summary judgment standard to support a retaliatory hostile work environment based upon conduct taking place after the interrogatory in which he was mentioned was filed in February 2001 in the *Boyd* lawsuit.[8] The Court finds that there is sufficient evidence on this claim to raise genuine issues of material fact and, therefore, the retaliation claim survives summary judgment.

Plaintiff has put forth evidence that, after the interrogatory was served, he was

---

[7] As one court has noted, there is a question as to whether, after the Supreme Court's decision in *Burlington Northern*, the standard for showing a retaliatory hostile work environment is less than the standard for a traditional hostile work environment claim because for a retaliation claim a plaintiff need only show a "materially adverse action" rather than an "adverse employment action." *See Khan v. HIP Centralized Lab. Servs., Inc.*, No. 03-CV-2411 (DGT), 2007 WL 1011325, at *9 (E.D.N.Y. Mar. 30, 2007) ("It is . . . unclear whether the Supreme Court's decision in *Burlington Northern*, 126 S.Ct. 2405, altered the standard for retaliatory hostile work environment claims.") In other words, if such a difference exists, a plaintiff could theoretically be subject to materially adverse actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 U.S. at 77 (quotations and citations omitted), but not "sufficiently severe or pervasive," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), to alter the conditions of plaintiff's employment. This Court need not decide this question as it concludes that plaintiff has raised sufficient issues of disputed fact under the higher standard to survive summary judgment and, therefore, would satisfy this lower standard as well.

[8] As a threshold matter, defendant argues that plaintiff has not engaged in "protected activity." However, "protected activity" covers a plaintiff's participation in a lawsuit, even if he was not a

plaintiff. *See, e.g., Cumbie v. Gen. Shale Brick, Inc.*, 302 Fed. Appx. 192, 194 (4th Cir. 2008) ("We distinguish protected activity as two distinct categories: opposition and participation. Opposition activity includes utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities. In determining whether an employee engages in legitimate opposition activity, we balance the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel. To proceed under the participation category, an individual must make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under Title VII.") (internal citation and quotation omitted). Here, a jury could reasonably infer that the information contained in the interrogatory in the *Boyd* action was provided by plaintiff to Boyd in an effort to assist Boyd in pursuing a claim of discrimination, which would constitute protected activity by plaintiff. In any event, plaintiff filed his own EEOC charge in 2001, and has put forth evidence that he was subjected to a retaliatory hostile work environment after that date as well. There is no question that the filing of this EEOC charge would constitute "protected activity" for purposes of a retaliation claim where it was based on a reasonable, good faith belief that a violation existed. *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Under the circumstances in the instant case, there is no basis to grant summary judgment to defendant on this ground.

regularly taunted by Caucasian co-workers, in the presence of supervisors. These taunts took the form of comments such as "N*****'s here. Can't say 'n*****' anymore," "Can't say n***** anymore or we might get sued," "be quiet, he's here," "watch your money, he's here," "here comes one of them," and "here comes a brother." (Stulberg Ex. 8, at 159-61, 217, 285-88; Ex. 3 at 19-21; Stulberg Ex. 4 at 7.) Such a steady barrage of racially discriminatory comments can provide a basis for a jury's reasonable finding that plaintiff was subjected to a hostile work environment. *See, e.g., Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). Therefore, summary judgment on this ground is denied.

## 2. Causal Connection

In Title VII retaliation claims, a plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Where there is no direct evidence of such animus, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)); *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Here, plaintiff has put forth direct evidence of retaliatory motive in the form of comments such as "Can't say 'n*****' anymore or we might get sued," and "Shhhh . . . he's here," implying that they did not want to speak in front of an African-American employee. In addition, these comments took place shortly after serving the interrogatory mentioning plaintiff in the *Boyd* action, which supports this interpretation of the comments. On this basis, if such evidence is credited, a reasonable jury could find, in light of the entire record, that these comments were motivated by retaliatory animus. Therefore, plaintiff has presented sufficient evidence to make a *prima facie* showing of retaliation under the summary judgment standard and to support a claim of a retaliatory hostile work environment. Accordingly, summary judgment on the retaliation claim is denied.

## V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied as to plaintiff's claims of a racially hostile work environment and a retaliatory hostile work environment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant's motion for summary judgment is granted as to plaintiff's failure to promote claim.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 29, 2009
Central Islip, NY

* * *

Plaintiff is represented by Robert B. Stulberg, Esq. of Broach & Stulberg, LLP, One Penn Plaza, Suite 2016, New York, NY 10119. Defendant is represented by Brian J. Finucane, Esq. of Fisher & Phillips, LLP, 104 West 9th Street, Suite 400, Kansas City, MO 64105.